IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

PHILLIP MYLES VIVIAN,

        Petitioner,                   No. CIV S-04-0390 FCD DAD P

    vs.

A. A. LaMARQUE, Warden,

        Respondent.             FINDINGS & RECOMMENDATIONS

_____/

        Petitioner is a state prisoner proceeding pro se with an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges a 2001 judgment of conviction entered against him in the San Joaquin County Superior Court on charges of second degree murder with use of a firearm.  He seeks relief on the grounds that: (1) the evidence introduced at his trial was insufficient to support his conviction for second degree murder; (2) his sentence constitutes cruel and unusual punishment; (3) his trial counsel provided ineffective assistance; and (4) his conviction violates the Equal Protection and Due Process Clauses because he was licensed to carry a firearm even though he was mentally unstable.  Upon careful consideration of the record and the applicable law, the undersigned will recommend that petitioner's application for habeas corpus relief be denied.

/////

PROCEDURAL AND FACTUAL BACKGROUND[1]

Following a jury trial, defendant Phillip Myles Vivian was found guilty of second degree murder (Pen. Code, § 187; further undesignated statutory references are to the Penal Code) and personal use of a firearm in the commission of the murder (§ 12022.53, subd. (d).) The trial court sentenced him to 15 years to life for the murder and a consecutive sentence of 25 years to life for the use of a firearm.

\* \* \*

On June 11, 2000, defendant and his best friend, Robert Labotte, were in Labotte's downstairs apartment, as they often were. Defendant had been a security guard for 23 years and had spent three years in the military. He was a loud and constant talker and well known around the complex as "Barney Fife" and "Maxie." He was sometimes seen checking out trouble in the apartment complex, carrying his gun. Labotte, on the other hand, was soft-spoken and seemed mentally slow. The two men could be heard arguing nearly every other day, although they were best friends. When they argued, defendant would call Labotte names. Labotte's upstairs neighbors, Raven Spriggs and Mykela Mays, had learned to tune out the arguing.

Between 12:30 p.m. and 1:00 p.m., the men started arguing. Spriggs did not pay any attention to the argument until it got very loud. Familiar with the men's voices, Spriggs heard defendant say "fuck you," God damn it," and "stupid". The last words she heard were defendant saying "fuck you." After approximately five minutes of silence, she heard a single gunshot. Mays, who had been napping, also heard the sound.

Immediately after the gunshot, Spriggs heard something hit the wall or ground and both women heard defendant yell in a voice that was upset and frantic, "help, help." Spriggs also heard defendant say, "I didn't mean it, it was an accident."

Mary Rojas lived across the breezeway from Labotte. She, too, sometimes heard defendant yelling at Labotte for such things as touching the VCR. She was watching television when she heard the gunshot. She went outside to investigate and heard defendant say "I'm sorry, I'm sorry, I didn't mean to, I didn't mean to." She called 911.

---

[1] The following summary is drawn from the April 22, 2002 opinion by the California Court of Appeal for the Third Appellate District (hereinafter Opinion), at pgs. 1-7, filed in this court on May 24 2004, as Exhibit D to the Answer.

2

The police arrived at the scene approximately five to 15 minutes after the incident. Stockton Police Officer Scott Cochran could not hear any voices inside Labotte's apartment. He knocked twice on the front door without getting any response. The third time he knocked, he announced that it was the police and told the occupants to open the door. After another 30 to 45 seconds, defendant opened the door.

Defendant quickly stepped forward and said, "I didn't mean it, it was an accident." Defendant was dressed and there was a small amount of blood on his hands and forearms. Labotte was dead on the kitchen floor, bleeding severely from a head wound. He had died instantly of a single gunshot to his left eye fired from a distance of over 18 inches away. The gun was on the living room table. Cochran took defendant into custody.

After being escorted to the patrol car, defendant talked about the shooting, vacillating between over-excitement and tears. He said the shooting had been an accident – that he had been watching television and cleaning his gun when it went off. He went through his story four times. He claimed that he thought he had emptied the gun and locked back the slide before inserting a bore brush in the slide. When he pulled out the bore brush, the slide went forward and the gun went off. He did not indicate he had any difficulty pulling the brush out of the barrel. He claimed he took so long to open the door because he was in the bathroom getting a towel to use as a tourniquet on Labotte. He thought he should try giving first aid before calling 911. Defendant also said he had tried mouth-to-mouth resuscitation to revive him but Labotte was bleeding, although there was no transfer blood on defendant's face when the officers arrived.

Officer Patrick Callahan, an expert in small firearms, inspected both the gun and the apartment. The gun, a Ruger P-85 nine-millimeter, semi-automatic, had one minor smear and several spots of blood in it. The empty magazine, which could hold 15 rounds, was inside the gun, and the slide was in the open position. There were no rounds of ammunition in the gun but there was a single spent shell casing in front of the coffee table. Next to the gun was an open newspaper with 15 live rounds of ammunition, an open bottle of cleaning solvent, and two cleaning rods. The wire tip of the bore brush was clean and dry, although the gun was dirty and poorly maintained. There were no solvent drips on the newspaper and there was no residue on the gun barrel.

Labotte lay on a sheet laid out on the kitchen floor with his head resting on a cushion. The quantity of blood near a chair in the kitchen indicated that Labotte had been seated when he was shot, possibly leaning against the south kitchen wall. There was a second pool of blood on the kitchen table. The television was on,

/////

tuned to a science fiction channel. The lighting in the living room was insufficient for properly cleaning a gun.

Defendant was interviewed at the police station later that evening. The jury watched the videotape of the interview. During the interview, defendant claimed he had accidentally shot Labotte while he was cleaning his gun with the bore brush. Prior to cleaning the gun, he took the precaution of having Labotte go into the kitchen just in case of an accidental discharge. He and Labotte were having a quiet conversation about the science fiction movie on television.

Defendant stated that he started to clean the gun by first taking the magazine out, emptying it, and putting it back into the gun. Whenever his gun was loaded, there was also a round in the chamber. He thought, however, that he had already ejected the live round that had been chambered in the gun. He then inserted a dry bore brush into the barrel. When he tried to pull the brush out, he realized it was stuck or jammed along the side of the round. He stood up and tried to pull out the bore brush. While doing so, he walked toward Labotte, talking about the movie. Seconds after he was able to pull out the brush, the slide somehow slid forward and the gun went off. Defendant also said Labotte asked what happened after he had been shot.

Officer Callahan testified at trial that if a live round had been in the chamber when the gun was being cleaned, sticking the bore brush down the chamber would have knocked the round out of the gun. Dean DeYoung, assistant laboratory director for the Department of Justice French Camp Forensic Laboratory, also inspected the gun. He explained that it was very unlikely that someone could pull the slide back on the gun without ejecting a cartridge that was left in the chamber. The gun is designed for the cartridge to fall out. He also testified that if a round had been left in the chamber and then a bore brush was inserted into the barrel, the brush would push the round out of the chamber. Moreover, the brush could not get jammed along the side of the round as defendant had suggested. He was unable, despite many attempts, to recreate the scenario described by defendant and concluded it was very unlikely to have occurred as defendant described because it would require the following simultaneous circumstances: an undetected round in the chamber with the slide release manually depressed, the safety in the off position, and the trigger pulled. The bore brush would also have to have cleared the muzzle and the gun pointed in the direction of the victim.

An instructor for the Security Guy testified that defendant had completed all the necessary courses for certification as an armed security guard. Defendant had twice attended a 14-hour, two-day firearms course, which included instruction on maintaining and cleaning firearms. Defendant also passed another four or five

4

firearm requalifications. No one had ever instructed defendant to clean a semi-automatic with a magazine inserted.

Defendant presented testimony from a forensic psychiatrist who had conducted a two-hour psychiatric evaluation of defendant in the jail. The psychiatrist concluded defendant had a possible attention deficit disorder with hyperactivity (ADHD) and an unspecified personality disorder. Adults suffering from ADHD tend to be unfocused, forgetful, inattentive, careless, easily distracted and have difficulty following complex directions. In 1986, defendant had suffered significant head trauma after being attacked by gang members with pipes. Defendant believes that the doctors placed a super-powered computer chip in his brain while he was hospitalized, making him faster and smarter than other people. He also believes the computer chip enables him to have photographic memory. Harboring these beliefs makes him feel better about himself and are consistent with ADHD. Also consistent with ADHD is reacting to a traumatic event by becoming "unglued."

Defendant had no prior history of violence, was thought of as nice and friendly by others in the apartment complex, and was not believed to be aggressive by his employer.

## ANALYSIS

I. Standards of Review Applicable to Habeas Corpus Claims

A writ of habeas corpus is available under 28 U.S.C. § 2254 only on the basis of some transgression of federal law binding on the state courts. See Peltier v. Wright, 15 F.3d 860, 861 (9th Cir. 1993); Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing Engle v. Isaac, 456 U.S. 107, 119 (1982)). A federal writ is not available for alleged error in the interpretation or application of state law. See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000); Middleton, 768 F.2d at 1085. Habeas corpus cannot be utilized to try state issues de novo. Milton v. Wainwright, 407 U.S. 371, 377 (1972).

This action is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). See Lindh v. Murphy, 521 U.S. 320, 336 (1997); Clark v. Murphy, 331 F.3d 1062, 1067 (9th Cir. 2003). Section 2254(d) sets forth the following standards for granting habeas corpus relief:

>An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
>(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
>(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). See also Penry v. Johnson, 532 U.S. 782, 792-93 (2001); Williams v. Taylor, 529 U.S. 362 (2000); Lockhart v. Terhune, 250 F.3d 1223, 1229 (9th Cir. 2001).

The court looks to the last reasoned state court decision as the basis for the state court judgment. Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004). Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under section 2254(d). Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003); Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000). When it is clear that a state court has not reached the merits of a petitioner's claim, or has denied the claim on procedural grounds, the AEDPA's deferential standard does not apply and a federal habeas court must review the claim de novo. Nulph v. Cook, 333 F.3d 1052, 1056 (9th Cir. 2003); Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

II. Petitioner's Claims

    A. Sufficiency of the Evidence

Petitioner claims that he was denied due process of law because there was insufficient evidence of malice introduced at his trial to support his conviction for second degree murder. He contends that the evidence demonstrated he shot Labotte accidentally while cleaning his gun and that, at most, he was guilty of involuntary manslaughter. Petitioner notes that although Labotte's neighbors testified they heard yelling coming from Labotte's apartment, the

1  yelling stopped at least five minutes prior to the actual shooting.  (Pet., Ex. A at 14.)  Petitioner
2  also notes that the prosecution expert testified the shooting could have occurred in the manner
3  petitioner described to the police, although it was unlikely.  (Id. at 15.)  Petitioner states there
4  was no evidence he had a motive to kill Labotte, who was his friend, and that his hysterical
5  reaction after the shooting indicated the incident was not deliberate.  He argues that the jury's
6  finding of malice was "evidently based upon pure speculation, surmise and/or conjecture."  (Id.)

7          The Due Process Clause of the Fourteenth Amendment "protects the accused
8  against conviction except upon proof beyond a reasonable doubt of every fact necessary to
9  constitute the crime with which he is charged."  In re Winship, 397 U.S. 358, 364 (1970).  There
10 is sufficient evidence to support a conviction if, "after viewing the evidence in the light most
11 favorable to the prosecution, any rational trier of fact could have found the essential elements of
12 the crime beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 319 (1979).  See also
13 Prantil v. California, 843 F.2d 314, 316 (9th Cir. 1988).  "[T]he dispositive question under
14 Jackson is 'whether the record evidence could reasonably support a finding of guilt beyond a
15 reasonable doubt.'"  Chein v. Shumsky, 373 F.3d 978, 982 (9th Cir. 2004) (quoting Jackson, 443
16 U.S. at 318).  A petitioner in a federal habeas corpus proceeding "faces a heavy burden when
17 challenging the sufficiency of the evidence used to obtain a state conviction on federal due
18 process grounds."  Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005).  In order to grant the
19 writ, the habeas court must find that the decision of the state court reflected an objectively
20 unreasonable application of Jackson and Winship to the facts of the case.  Id. at 1275.

21         The court must review the entire record when the sufficiency of the evidence is
22 challenged in habeas proceedings.  Adamson v. Ricketts, 758 F.2d 441, 448 n.11 (9th Cir. 1985),
23 vacated on other grounds, 789 F.2d 722 (9th Cir. 1986) (en banc), rev'd, 483 U.S. 1 (1987).  It is
24 the province of the jury to "resolve conflicts in the testimony, to weigh the evidence, and to draw
25 reasonable inferences from basic facts to ultimate facts."  Jackson, 443 U.S. at 319.  If the trier of
26 fact could draw conflicting inferences from the evidence, the court in its review will assign the

7

inference that favors conviction. McMillan v. Gomez, 19 F.3d 465, 469 (9th Cir. 1994). "The relevant inquiry is not whether the evidence excludes every hypothesis except guilt, but whether the jury could reasonably arrive at its verdict." United States v. Dinkane, 17 F.3d 1192, 1196 (9th Cir. 1994) (quoting United States v. Mares, 940 F.2d 455, 458 (9th Cir. 1991)). See also Roehler v. Borg, 945 F.2d 303, 306 (9th Cir. 1991). The federal habeas court determines the sufficiency of the evidence in reference to the substantive elements of the criminal offense as defined by state law. Jackson, 443 U.S. at 324 n.16; Chein, 373 F.3d at 983.

The California Court of Appeal rejected petitioner's arguments in this regard, reasoning as follows:

> Defendant argues "the overwhelming weight of the evidence supported the theory that [defendant] was guilty of involuntary manslaughter, only." His argument, however, necessarily depends upon the acceptance of his recitation of how the events of the incident occurred and upon crediting the testimony of his psychiatrist. In other words, it depends upon us reweighing the evidence. It should be obvious from long-standing precedent that we cannot engage such a test. (citation omitted.)
>
> There is substantial evidence to support the jury's finding of second degree murder. The evidence supported the inference that defendant was not cleaning his gun at the time of the shooting. The bore brush had no residue on it and there were no indications, other than the display on the living room table of cleaning equipment, that defendant had been cleaning his gun. Experts also testified that it was very unlikely the gun accidentally fired in the manner defendant insists it occurred. There was evidence of an argument shortly before the gun was fired and that defendant was trained in the use and cleaning of firearms. The evidence also supported the inference that defendant was spending the moments after the shooting preparing the room to look as if he had been cleaning his gun and that he did little to nothing to summon medical assistance for the victim. Thus, the jury could reasonably infer that, despite defendant's claims to the contrary, defendant did not accidentally shoot the victim while cleaning his gun. With no mitigating circumstances, the presumption of malice operates to support the judgment. (citation omitted.)
>
> Even if we were to conclude that the jury could reasonably believe defendant's version of the events and psychiatrist, reversal still would not be warranted. The issue here is not whether the evidence adduced at trial would support conviction of some lesser offense but rather whether the record contains substantial evidence

Case 2:04-cv-00390-FCD-DAD   Document 11   Filed 01/22/08   Page 9 of 18

> to support the conviction. As discussed above, we have determined that it does. (citation omitted.) The evidence he asserts tends to exculpate him does not do so when considered in the light most favorable to the judgment.

(Opinion at 7-9.)

Under California law, malice is required to sustain a conviction of second degree murder. People v. Lewis, 1 Cal. App. 3d 698, 701 (1969). Malice may be inferred from the circumstances of the homicide and may be either express or implied. Id. Malice is express "when there is manifested a deliberate intention unlawfully to take away the life of a fellow-creature." Id. Malice is implied "when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." Id. See also Cal. Penal Code § 188. Viewing the evidence in the light most favorable to the verdict, and for the reasons described by the California Court of Appeal, the undersigned concludes that there was sufficient evidence from which a rational trier of fact could have found beyond a reasonable doubt that petitioner harbored implied malice at the moment he killed Labotte. The state appellate court opinion rejecting petitioner's claim in this regard is a reasonable construction of the evidence in this case and is not contrary to or an objectively unreasonable application of federal law. See Woodford v. Visciotti, 537 U.S. 19, 25 (2002); see also 28 U.S.C. § 2254(d)(1). Accordingly, petitioner is not entitled to habeas relief on this claim.

### B. Cruel and Unusual Punishment

Petitioner claims that his sentence of 40 years to life in prison constitutes cruel and unusual punishment in violation of the Eighth Amendment. He contends that, under the circumstances of this case, the sentence he received is grossly disproportionate to his crime. Petitioner argues that he did not intend to kill Labotte; had a minimal criminal history; had a history of ADHA, which made him unfocused and disorganized; held a productive job in spite of his disability; and is a non-violent person. (Pet., Ex. A at 18-21.) Petitioner also contends that his sentence is more severe than the sentence received by murderers within and outside the state

9

of California who committed more heinous crimes than he, and murderers who did not use a gun in the commission of their crimes. (Id. at 21- 24.)

In his opening brief in state court on appeal, petitioner recognized that an Eighth Amendment challenge to his sentence might have been waived by his failure to raise it in the trial court. (Id. at 31.) He claimed, however, that his trial counsel was ineffective in failing to object to his sentence on Eighth Amendment grounds and that the state appellate court could address his Eighth Amendment claim in addressing his ineffective assistance of counsel claim. (Opinion at 10.) The California Court of Appeal found that petitioner waived his Eighth Amendment claim when he failed to object to his sentence on that basis in the trial court. (Id.) The state appellate court concluded, however, that petitioner's trial counsel did not render ineffective assistance because "the constitutional argument defendant contends his attorney should have made is without merit." (Id.) Specifically, the appellate court found, after conducting a detailed analysis, that petitioner's sentence was not "disproportionate to his offense under state standards, nor is it 'grossly disproportionate' under federal standards." (Id. at 16.)

Respondent argues that the ruling by the California Court of Appeal constitutes a state procedural bar precluding this court from addressing the merits of petitioner's Eighth Amendment claim. (Answer at 11.) State courts may decline to review a claim based on a procedural default. Wainwright v. Sykes, 433 U.S. 72 (1977). As a general rule, a federal habeas court "'will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment.'" Calderon v. United States District Court (Bean), 96 F.3d 1126, 1129 (9th Cir. 1996) (quoting Coleman v. Thompson, 501 U.S. 722, 729 (1991)). The state rule for these purposes is only "adequate" if it is "firmly established and regularly followed." Id. (quoting Ford v. Georgia, 498 U.S. 411, 424 (1991)). See also Bennett v. Mueller, 322 F.3d 573, 583 (9th Cir. 2003) ("[t]o be deemed adequate, the state law ground for decision must be well-established and consistently applied.") The state rule must also be "independent" in that it

is not "interwoven with the federal law." Park v. California, 202 F.3d 1146, 1152 (9th Cir. 2000) (quoting Michigan v. Long, 463 U.S. 1032, 1040-41 (1983)). Even if the state rule is independent and adequate, the claims may be reviewed by the federal court if the petitioner can show: (1) cause for the default and actual prejudice as a result of the alleged violation of federal law; or (2) that failure to consider the claims will result in a fundamental miscarriage of justice. Coleman, 501 U.S. at 749-50.

Respondent has met his burden of adequately pleading an independent and adequate state procedural ground as an affirmative defense. See Bennett, 322 F.3d at 586. Petitioner does not deny that his trial counsel did not raise a contemporaneous objection to his sentence on Eighth Amendment grounds. Petitioner has failed to meet his burden of asserting specific factual allegations demonstrating the inadequacy of California's contemporaneous-objection rule as unclear, inconsistently applied or not well-established, either as a general rule or as applied to him. Id.; Melendez v. Pliler, 288 F.3d 1120, 1124-26 (9th Cir. 2002). Petitioner's claim is therefore procedurally barred. See Coleman, 501 U.S. at 747; Harris v. Reed, 489 U.S. 255, 264 n.10 (1989); Paulino v. Castro, 371 F.3d 1083, 1092-93 (9th Cir. 2004) (claim that defendant's due process rights were violated by the trial court's failure to instruct sua sponte on the definition of "major participant" was procedurally barred because counsel failed to make a contemporaneous objection to the instruction at trial). Petitioner has also failed to demonstrate that there was cause for his procedural default or that a miscarriage of justice would result absent review of the claim by this court. See Coleman, 501 U.S. at 748; Vansickel v. White, 166 F.3d 953, 957-58 (9th Cir. 1999). The court is therefore precluded from considering the merits of this claim.

Even were this claim not procedurally barred, it lacks merit. In Lockyer v. Andrade, 538 U.S. 63 (2003), the United States Supreme Court found that in addressing an Eighth Amendment challenge to a prison sentence, the "only relevant clearly established law amenable to the 'contrary to' or 'unreasonable application of' framework is the gross

disproportionality principle, the precise contours of which are unclear and applicable only in the 'exceedingly rare' and 'extreme' case." Id. at 73 (citing Harmelin v. Michigan, 501 U.S. 957, 1001 (1991); Solem v. Helm, 463 U.S. 277, 290 (1983); and Rummel v. Estelle, 445 U.S. 263, 272 (1980)). The U.S. Supreme Court in Andrade concluded that two consecutive twenty-five years to life sentences with the possibility of parole, imposed under California's Three Strikes law following two petty theft convictions with priors, did not amount to cruel and unusual punishment. Id. at 77; see also Ewing v. California, 538 U.S. 11 (2003) (holding that a sentence of twenty-five years to life imposed for felony grand theft under California's Three Strikes law did not violate the Eighth Amendment).

Following the decision in Andrade the United States Court of Appeals for the Ninth Circuit held that a third strike sentence of twenty-five years to life in prison for a third shoplifting offense, a "wobbler" under state law[2], constituted cruel and unusual punishment. Ramirez v. Castro, 365 F.3d 755 (9th Cir. 2004). In so holding, the court relied upon the limited and non-violent nature of the petitioner's prior criminal history and the fact that the petitioner's only prior period of incarceration had been a single one-year jail sentence. Id. at 768-69. Thereafter, in Rios v. Garcia, 390 F.3d 1082 (9th Cir. 2004), another panel of the Ninth Circuit distinguished the holding in Ramirez from the situation it confronted, finding that the petitioner in Rios had a "lengthy criminal history," had "been incarcerated several times," and that the prior strikes used to enhance the petitioner's sentence had "involved the threat of violence." Id. at 1086.

This court finds that in this case petitioner's sentence does not fall within the type of "exceedingly rare" circumstance that would support a conclusion that his sentence violates the Eighth Amendment. Petitioner's jury found that he committed the deliberate murder of Labotte. Under those circumstances, the state courts' rejection of petitioner's Eighth Amendment claim

---

[2] A "wobbler" is an offense that can be punished as either a misdemeanor or a felony under applicable law. See Ferreira v. Ashcroft, 382 F.3d 1045, 1051 (9th Cir. 2004).

was neither contrary to, nor an unreasonable application of clearly established federal law, as set forth above.  This claim for relief should therefore be denied.

### C. Ineffective Assistance of Trial Counsel

Petitioner next claims that his trial counsel rendered ineffective assistance because of his failure to object to petitioner's sentence on the grounds that it constitutes cruel and unusual punishment and by failing to present a diminished capacity defense.  After setting forth the applicable legal principles, this court will analyze these claims in turn below.

#### 1. Legal Principles

The Sixth Amendment guarantees the effective assistance of counsel.  The United States Supreme Court set forth the test for demonstrating ineffective assistance of counsel in Strickland v. Washington, 466 U.S. 668 (1984).  To support a claim of ineffective assistance of counsel, a petitioner must first show that, considering all the circumstances, counsel's performance fell below an objective standard of reasonableness.  See Strickland, 466 U.S. at 687-88.  After a petitioner identifies the acts or omissions that are alleged not to have been the result of reasonable professional judgment, the court must determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance.  Id. at 690; Wiggins v. Smith, 539 U.S. 510, 521 (2003).

Second, a petitioner must establish that he was prejudiced by counsel's deficient performance.  Strickland, 466 U.S. at 693-94.  Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at 694.  A reasonable probability is "a probability sufficient to undermine confidence in the outcome."  Id.  See also Williams, 529 U.S. at 391-92; Laboa v. Calderon, 224 F.3d 972, 981 (9th Cir. 2000).  A reviewing court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies . . . .  If it is easier to dispose of an ineffectiveness claim on the ground of

/////

lack of sufficient prejudice . . . that course should be followed." Pizzuto v. Arave, 280 F.3d 949, 955 (9th Cir. 2002) (quoting Strickland, 466 U.S. at 697).

In assessing an ineffective assistance of counsel claim "[t]here is a strong presumption that counsel's performance falls within the 'wide range of professional assistance.'" Kimmelman v. Morrison, 477 U.S. 365, 381 (1986) (quoting Strickland, 466 U.S. at 689). There is in addition a strong presumption that counsel "exercised acceptable professional judgment in all significant decisions made." Hughes v. Borg, 898 F.2d 695, 702 (9th Cir. 1990) (citing Strickland, 466 U.S. at 689). However, that deference "is predicated on counsel's performance of sufficient investigation and preparation to make reasonably informed, reasonably sound judgments." Mayfield v. Woodford, 270 F.3d 915, 927 (9th Cir. 2001) (en banc).

### 2. Cruel and Unusual Punishment

Petitioner claims that his trial counsel rendered ineffective assistance when he failed to object to petitioner's sentence on Eighth Amendment grounds. Petitioner raised this claim for the first time on direct appeal. The California Court of Appeal rejected petitioner's argument in this regard, concluding that:

> The punishment imposed on defendant, including the mandatory part of that sentence, was not "so disproportionate to the crime for which it [was] inflicted that it shocks the conscience and offends fundamental notions of human dignity" or otherwise "grossly disproportionate." Accordingly, defense counsel was not ineffective for failing to challenge the sentence on that ground in the trial court.

(Opinion at 16.) The state court's decision in this regard is not an unreasonable application of Strickland and should not be set aside. For the reasons set forth above, a claim that petitioner's sentence of 40 years to life for second degree murder constitutes cruel and unusual punishment in violation of the Eighth Amendment lacks merit. Counsel's failure to make a meritless argument does not constitute ineffective assistance. Jones v. Smith, 231 F.3d 1227, 1239 n.8 (9th Cir. 2000) (citing Boag v. Raines, 769 F.2d 1341, 1344 (9th Cir. 1985)). See also Rupe v. Wood, 93

/////

F.3d 1434, 1445 (9th Cir. 1996) ("the failure to take a futile action can never be deficient performance"). Accordingly, petitioner is not entitled to relief on this claim.

### 3. Diminished Capacity Defense

Petitioner also claims that his trial counsel rendered ineffective assistance by failing to "raise a diminished actuality defense which was supported by evidence that petitioner suffered from attention deficit hyperactive disorder." (Pet., Ex. B at 13.) Respondent notes that the diminished capacity defense was abolished in California in 1981 and argues that "counsel did not provide substandard representation by withholding a defense that had been abrogated nineteen years before trial commenced." (Answer at 14.)

Petitioner's claim in this regard was raised for the first time in a petition for writ of habeas corpus filed in the California Supreme Court. (Answer, Ex. G.) The Supreme Court summarily denied the petition. (Answer, Ex. H.)

Cal. Penal Code § 25 provides in pertinent part:

> (a) The defense of diminished capacity is hereby abolished. In a criminal action, as well as any juvenile court proceeding, evidence concerning an accused person's intoxication, trauma, mental illness, disease, or defect shall not be admissible to show or negate capacity to form the particular purpose, intent, motive, malice aforethought, knowledge, or other mental state required for the commission of the crime charged.
>
> * * *
>
> (c) Notwithstanding the foregoing, evidence of diminished capacity or of a mental disorder may be considered by the court only at the time of sentencing or other disposition or commitment.

Cal. Penal Code § 28 provides, in relevant part:

> (a) Evidence of mental disease, mental defect, or mental disorder shall not be admitted to show or negate the capacity to form any mental state, including, but not limited to, purpose, intent, knowledge, premeditation, deliberation, or malice aforethought, with which the accused committed the act. Evidence of mental disease, mental defect, or mental disorder is admissible solely on the issue of whether or not the accused actually formed a required specific intent, premeditated, deliberated, or harbored malice aforethought, when a specific intent crime is charged.

15

> (b) As a matter of public policy there shall be no defense of diminished capacity, diminished responsibility, or irresistible impulse in a criminal action or juvenile adjudication hearing.
>
> Cal. Penal Code § 29 states:
>
> In the guilt phase of a criminal action, any expert testifying about a defendant's mental illness, mental disorder, or mental defect shall not testify as to whether the defendant had or did not have the required mental states, which include, but are not limited to, purpose, intent, knowledge, or malice aforethought, for the crimes charged. The question as to whether the defendant had or did not have the required mental states shall be decided by the trier of fact.

Petitioner concedes that a diminished capacity defense was not available to his trial counsel. (Pet., Ex. B. at 13.) However, he argues that California law "did not prohibit evidence of the actual existence of a particular mental state to be introduced at the guilt phase" and that "evidence of both capacity to form and actual existence of a mental state are admissible at the sentencing phase." (Id.) Petitioner also argues that "counsel provided ineffective assistance, by failing to raise the issue during sentencing, that his mental condition proved that he was entitled to a lesser penalty of involuntary, or at most, voluntary manslaughter." (Id. at 15.) Petitioner is apparently contending that, pursuant to the statutes set forth above, his trial counsel was permitted to introduce evidence of his ADHD disorder and/or "mental state" to establish that petitioner did not actually form the required specific intent to kill. Petitioner argues that his trial counsel rendered ineffective assistance by failing to introduce such evidence, either during trial or at sentencing.

Petitioner has failed to establish either defective performance or prejudice with respect to this claim. As explained above, petitioner's trial counsel introduced evidence, through a psychiatrist, that petitioner suffered from ADHD and an unspecified personality disorder and that he had suffered significant head trauma. The defense psychiatrist also testified that petitioner believed he had a computer chip implanted in his brain and that petitioner's ADHD could cause him to react to a traumatic event by becoming "unglued." Petitioner's trial counsel argued to the jury, consistent with petitioner's statements to the police, that the shooting was an

16

1 accident. (Reporter's Transcript on Appeal at 399-404, 415-16.) Counsel also argued that the
2 accident occurred because petitioner "wasn't paying attention because he's Attention Deficit
3 Disordered" and that petitioner was only guilty of involuntary manslaughter. (Id. at 399-400,
4 411-12.) Petitioner has failed to explain what additional evidence of mental incapacity counsel
5 should have introduced. He has also failed to demonstrate how any additional evidence
6 regarding his mental state would have resulted in a different verdict.

7 In assessing an attorney's performance, a reviewing court must make every effort
8 to "evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689.
9 This evaluation must include "an objective review of [counsel's] performance, measured for
10 'reasonableness under prevailing professional norms,' which includes a context-dependent
11 consideration of the challenged conduct." Wiggins v. Smith, 539 U.S. 510, 523 (2003) (quoting
12 Strickland, 466 U.S. at 688). Under the law prevailing at the time of petitioner's trial, this court
13 cannot find that petitioner's trial counsel was ineffective in failing to present additional evidence
14 of petitioner's mental state, or in failing to raise a "diminished actuality defense." Accordingly,
15 petitioner is not entitled to relief on this claim. See Summerlin v. Stewart, 341 F.3d 1082, 1094
16 (9th Cir. 2003), reversed and remanded on other grounds by Schriro v. Summerlin, 542 U.S. 348
17 (2004) (trial counsel not ineffective in failing to request a jury instruction on diminished capacity
18 where that defense had been abrogated by the state legislature).

19     D. Due Process

20 Petitioner's final claim is that his conviction violates "equal protection and due
21 process" because he was licensed to carry a firearm even though he was mentally unstable. (Pet.,
22 Ex. B at 15.) Petitioner asserts that "allowing someone to carry a firearm, with the mental
23 abnormalities, such as petitioner, there is clearly something wrong with the system." (Id. at 17.)
24 This claim was presented in petitioner's state habeas petition which was summarily denied by the
25 California Supreme Court. (Answer, Ex. H.)
26 /////

Petitioner is claiming, essentially, that the state of California improperly issued him a license to carry a firearm. This claim is not cognizable in a federal habeas corpus action. As discussed above, a writ of habeas corpus is not available for alleged error in the application of state law. Estelle v. McGuire, 502 U.S. at 67-68; Engle v. Isaac, 456 U.S. 107, 119 (1982). Petitioner has failed to demonstrate that the state's alleged erroneous issuance of a firearm license violated the federal constitution.

CONCLUSION

Accordingly, for the foregoing reasons, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within ten days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: January 22, 2008.

_____
DALE A. DROZD
UNITED STATES MAGISTRATE JUDGE

DAD:8
vivian390.hc